## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mary S. L., | Case No. 23-cv-312 (NEB/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi, | |
| *Acting Commissioner of Social Security*, | |
| Defendant. | |

This matter is before the Court on Plaintiff Mary S. L.'s Motion for Summary Judgment (Dkt. 10) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 12). Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying her claims for Supplemental Security Income and Disability Insurance Benefits under Titles XVI and II of the Social Security Act. (*See* Dkt. 1.) She seeks reversal and an award of benefits, or at a minimum, reversal and a remand for further proceedings. (Dkt. 13 at 1.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's Motion be granted in part, Defendant's Cross-Motion be denied, and that this case be remanded to the Commissioner consistent with this Report and Recommendation.

## I.    BACKGROUND

On August 20, 2021, Plaintiff filed a Title XVI application for supplemental security income and a Title II application for disability insurance benefits, alleging disability as of May 6, 2019.  (R. 63, 83, 108, 118, 241, 247.)[1]  Her applications were denied initially on January 15, 2021 and on reconsideration on May 12, 2021.  (R. 11, 131, 141.)  Plaintiff filed a written request for a hearing, and on December 15, 2021, Plaintiff appeared telephonically and testified at a hearing before Administrative Law Judge Micah Pharris ("the ALJ").  (R. 11, 36, 41-53, 149, 185, 210, 233.)  The ALJ issued an unfavorable decision finding Plaintiff not disabled on January 10, 2022.  (R. 8-27.)

Following the five-step sequential evaluation processes under 20 C.F.R. §§ 416.920(a) and 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. 9.

[2]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in a substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

not engaged in substantial gainful activity since May 6, 2019, the alleged onset date of disability.  (R. 13.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: lumbar degenerative disc disease, status post fusion surgery, left hip degenerative joint disease, and left knee degenerative joint disease.  (R. 14.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 18.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the individual would need to use a cane while walking but not while standing in place. The individual may never climb ropes, ladders, or scaffolds; and may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The individual may have no exposure to unprotected heights or hazards, as the term hazards is defined in the [Dictionary of Occupational Titles ("DOT")] and the [Selected Characteristics of Occupations ("SCO")].

(R. 19.)

Based on the testimony of the vocational expert ("VE") and a review of the record, the ALJ found at step four that Plaintiff was capable of performing her past relevant work as a Receptionist, DOT code #237.367-038, semi-skilled work with a Specific Vocational Preparation ("SVP") of 4, at the sedentary exertional level as generally performed.  (R. 26.)  The ALJ therefore found Plaintiff was not disabled.  (R. 26-27.)

Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-3.) Plaintiff then commenced this action for judicial review. (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of the record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.   RELEVANT RECORD

### A.   Medical Record

Plaintiff began taking 37.5mg of venlafaxine[3] once daily on May 9, 2014, which was increased to 75mg once daily as of November 6, 2015, as well as lorazepam[4] 0.5mg for anxiety, up to three times daily as needed on March 14, 2014. (R. 568-69, 615-16, 638.) Venlafaxine was increased to 150 mg once daily on January 5, 2018 at Plaintiff's request, as she was experiencing "some increased anxiety" (although she did not feel "particularly depressed"). (R. 534, 537.)

---

[3]   Venlafaxine "is used to treat depression" and "is also used to treat general anxiety disorder, social anxiety disorder, and panic disorder." *Venlafaxine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379 (last visited November 16, 2023).

[4]   Lorazepam "is used to treat anxiety disorders" and "also used for short-term relief of the symptoms of anxiety or anxiety caused by depression." *Lorazepam (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/lorazepam-oral-route/description/drg-20072296 (last visited November 16, 2023).

On February 14, 2017, Plaintiff visited Gateway Family Health Clinic with complaints of continued chronic low back pain that radiated to her left leg. (R. 413.) It was noted that Plaintiff had seen a doctor regarding her left leg about a year before and was to have follow-up visits thereafter, but those were not scheduled because she did not have insurance. (R. 413.) However, she had been stretching at home. (R. 413.) She stated her desire to start physical therapy. (R. 413.) Her past medical history was inclusive of anxiety and depression, and she was taking lorazepam "usually about once per day." (R. 414.) During that visit, she was observed to be alert and in no distress, ambulated with a normal gait, and moved around the room easily with normal strength in her lower extremities. (R. 414.) She was referred to physical therapy for evaluation and chronic back and neck pain treatment. (R. 415.)

February 7, 2017 radiology views of Plaintiff's chest showed marked scoliosis of the lumbar spine with disc degeneration and no radiographic evidence of active cardiopulmonary disease. (R. 547.) On May 30, 2017, Plaintiff complained of continuous low back pain that radiated into her entire left leg with periodic right-sided symptoms. (R. 538.) Plaintiff had an epidural steroid injection and other back injections from 2014 to 2015, but they did not help. (R. 501, 510, 513.)

Plaintiff's medical records note repeated falls beginning in 2018. (*E.g.*, R. 475, 484, 501, 510, 513, 522.) On May 29, 2018, she stated that she fell at the grocery store, leading to her right forearm hitting a cart corral and getting bruised. (R. 522.) She complained of numbness and paresthesia in her left leg on September 25, 2018, stating that if she was not paying attention to her left foot when walking, it would not lift, and

she would trip and fall.  (R. 510.)  She reported falling on the courthouse steps about two weeks earlier, resulting in injury to her left ribs and right hand.  (R. 510.)  On December 6, 2018, she reported that a doctor told her she had a pinched nerve in her back that was causing symptoms in her left leg and was to see a spine surgeon for it.  (R. 501.)

Plaintiff underwent an anterior lumbar interbody fusion ("ALIF") spinal surgery on May 6, 2019.  (R. 358.)  While she had experienced pain in her left leg before the surgery, after the surgery, she began reporting increasing pain level throughout the day in her back and right leg.  (R. 361.)  She was diagnosed with osteoarthritis of the knee (unspecified).  (R. 358.)  She had a walker at home that she was to use while healing from surgery.  (R. 365.)  As of May 7, 2019, her left leg felt better.  (R. 366.)  However, she developed some numbness, tingling, and paresthesia down her right leg "immediately" after her back surgery and was ambulating with a cane as of June 3, 2019. (R. 487.)  A June 14, 2019 view of her lumbar spine showed status post interbody fusion at the L5-S1 level and extremely severe levoscoliosis[5] centered at L2-3.  (R. 545.)

On July 11, 2019, Plaintiff visited one of her primary care doctors, Maggie Neudecker, MD, of Gateway Family Health Clinic, and complained of ongoing pain, swelling, paresthesia, and tiredness in her right leg, weakness in her left leg, as well as ongoing low back pain.  (R. 484.)  She had been ambulating with a cane and reported falling 4 times in the past week.  (R. 484.)  She reported increased anxiety since her surgery and that she had been more anxious about her health and why she was having

---

[5]      Scoliosis is the curvature and rotation of the vertebrae.  https://www.ncbi.nlm.nih. gov/pmc/articles/PMC2532872/ (last visited November 16, 2023).

ongoing symptoms. (R. 484.) She would take a periodic lorazepam as needed, which helped. (R. 484.) Dr. Neudecker's general examination of Plaintiff's back showed it was "nontender to palpation over lumbar spine, demonstrated mild tenderness to palpation over bilateral [sacroiliac] joints and paraspinal muscles, decreased [range of motion] with flexion and extension, relatively good [range of motion] with rotation at hips" and she was "able to ambulate on toes but not heels, ambulates with a cane." (R. 485.) Her strength was 4+/5 in her bilateral lower extremities, and she was "most notably weak in left hip flexor muscles." (R. 485.)

An August 8, 2019 CT scan of Plaintiff's lumbar spine showed no evidence of bone or hardware fracture or loosening or infection of the orthopedic hardware. (R. 407-08.) On the same day, she met with Christopher N. Thiessen, MD, of Gateway Family Health Clinic, for medication management and complained of "some increased anxiety for the past month." (R. 479.) Her PHQ-9 and GAD-7 scores[6] were 9, indicating mild depression and anxiety. (R. 479.)

Plaintiff began attending physical therapy for frequent falls, balance impairment, and history of concussions on November 13, 2019 and was discharged on January 22, 2020, with a last treatment date of November 22, 2019. (R. 396-98.) During her initial

---

[6]     The Patient Health Questionnaire ("PHQ-9") score is a depression screening tool. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited November 16, 2023). A score of 5-9 indicates mild depression, 10-14 indicates moderate, 15-19 indicates moderately severe, and 20-27 indicates severe. *Id.* Likewise, the Generalized Anxiety Disorder 7-item ("GAD-7") is an anxiety screening tool. https://www.ncbi. nlm.nih.gov/pmc/articles/PMC7306644/ (last visited November 16, 2023). A score of 5-9 indicates mild anxiety; 10-14 indicates moderate anxiety; and greater than 15 indicates severe anxiety. *Id.*

evaluation, Plaintiff's therapist reported that she seemed "to be stuck in a cycle of decreased mobility with increased fear of falling also resulting in further decreased mobility and less community involvement creating more anxiety." (R. 397-98.) Plaintiff reported falling more frequently in the past 3 years, more so since her May 2019 surgery; she experienced difficulty getting up after falling; she had fallen 3 times since September; and had suffered falls in the past that left her unconscious (the last being in February 2018). (R. 397.) Her most recent fall was 8 days before the appointment. (R. 397.)

Plaintiff noted that "as a result of her symptoms she ha[d] been more isolated and stays in her house. . . . She has a lot of anxiety because of her falls in addition to bruising, and she is afraid to go out because she is afraid of falling and hurting herself." (R. 397.) She noted concerns of left lower extremity weakness (related to a history of back pain and back surgeries) that she thought contributed significantly to the frequency of her falls. (R. 396.) She described a painful numb sensation of her right foot, mostly the great toe and fifth toe, "currently uses a single-point cane when walking to help her with slowing down and clearing her foot fully off the ground," and "appear[ed] unsteady when ambulating without use of the cane." (R. 397.) The therapist recommended that Plaintiff attend therapy at least twice per week up to 12 weeks pending progress. (R. 399.) Instead, Plaintiff attended "2 physical therapy treatments on 11/13/2019 and 11/22/2019" and "had 1 no show on 11/14/2019 and then 4 subsequent cancellations." (R. 396.) "[S]he felt she could not incorporate [physical therapy] into her current schedule due to some other issues she was dealing with at this time." (R. 396.) She was "very sorry" for missing appointments and stated that she "was unable to get herself

motivated to come out to the appointment secondary to anxiety and fatigue."  (R. 403.)
The notes from her November 22, 2019 visit state that she was unable to complete a sit to
stand exercise without the use of her upper extremities after 2 attempts.  (R. 403-04.)  Her
King-Devick balance test results were: "0.0 sway, narrow-based stance, eyes closed on
firm surface; tandem stance right 0.8 sway, and tandem stance left 1.5 sway with patient
losing balance on 6 occasions recovering each time," with "[c]ues needed to validate
testing to not grab onto bars and to attempt to recover balance with trunk."[7]  (R. 403.)
The therapist reported that Plaintiff's "typical day" consisted of watching TV, doing
laundry, cleaning, and cooking.  (R. 397.)

On November 25, 2019, Plaintiff complained to Dr. Thiessen of "at least" 1 fall
due to her left foot since her last visit of October 14, 2019, when she had complained of a
fall that resulted in a lump on her head for 3 weeks.  (R. 466, 471.)  She told Dr. Thiessen
during that visit that she was to attend physical therapy soon and had been seen by Dr.
Neudecker in August regarding her frequent falls.  (R. 466, 471, 473.)

On January 16, 2020, Plaintiff visited Michael D. Eckroth, PAC, of Twin Cities
Spine Center, who noted Plaintiff's prior May 6, 2019 ALIF procedure with preoperative
chief complaints of low back pain that radiated into her left buttock and down her left leg.
(R. 428.)  A postoperative CT scan of her lumbar spine showed "the stand alone [sic]
ALIF at the L5-S1 level" and "a plate and screws that appear[ed] to be well placed with
no sign of instrumentation failure."  (R. 430-31.)  During her January 16 visit, she

---

[7]      The King-Devick balance test is described at https://help.kingdevicktest.com/
ArticleView/DisplayArticle/154 (last visited November 16, 2023).

reported severe back pain with a component of bilateral buttock pain and severe numbness and tingling from "the knee to the feet bilaterally" and stated that prolonged positions such as standing and sitting increased her pain and caused discomfort. (R. 428.) Plaintiff reported that she was unable to walk 1 city block without needing to sit down and rest due to pain and noted loss of balance with episodes of tripping and buckling of the lower extremities as well as numbness and tingling of the lower extremities. (R. 428-29.)

As of her January 16 visit, Plaintiff had participated in physical therapy and chiropractic care, received spine injections, taken anti-inflammatories, and was undergoing pain medication management. (R. 428.) She was diagnosed with lumbar spinal stenosis and degenerative scoliosis. (R. 430.) PAC Eckroth observed that Plaintiff was in no acute distress; she had a tall erect posture with normal gait; there were no asymmetry or gross abnormalities upon palpation of her bilateral lower extremities; she had full range of motion of hips and knees and good coronal and sagittal balance, and exhibited non-sensory dermatomal deficit in her lower extremities from her bilateral knees to feet. (R. 430.) The plan was to order a new MRI scan of Plaintiff's lumbar spine, which was performed on February 6, 2020. (R. 393-94, 430.)

On February 17, 2020, PAC Eckroth informed Plaintiff by letter after reviewing the MRI scan that the likely explanation for her severe ongoing back pain was due to "wear and tear," she had developed significant arthritic type changes within her facet joints as well as degenerative scoliosis, and her bilateral buttock and leg symptomatology was due to continued impingement or pinching of the nerves that ran down her legs. (R.

426.)  He presented Plaintiff with the option of continuing conservative care, including chiropractic care, physical therapy, acupuncture, pain management, and activity modification, with surgery described as a "large undertaking."  (R. 426.)

On February 25, 2020, Plaintiff complained to Dr. Thiessen of worsening left hip and thigh pain that had persisted for about 6 weeks, noting her "last four falls ha[d] been onto that side (last fall 6 weeks ago) after tripping while wearing slippers in her hallway, landing on her left hip and rolled with left leg stuck underneath her."  (R. 455.)  While her musculoskeletal range of motion was normal, she had pain due to internal rotation of an unspecified hip (possibly the right), and reduced range of motion on the left.  (R. 457.)

On May 21, 2020, Plaintiff visited Amir A. Mehbod, MD, of Twin Cities Spine Center telephonically.  (R. 423.)  She reported back and bilateral buttock pain, right side greater than left, which radiated into her "entire leg," which worsened with standing and walking but was better when sitting.  (R. 423.)  Dr. Mehbod agreed with PAC Eckroth's assessment and noted that surgery would require extending the fusion "all the way to T12" and the ilium.  (R. 423.)

On May 28, 2020, Plaintiff underwent diagnostic imaging for her back pain, scoliosis, with a lateral view of her cervical spine showing the lower skull through the superior thoracic spine with no evidence of fracture or malalignment.  (R. 388.)  The disc spaces were well preserved, and the paravertebral soft tissues were unremarkable, with a negative study impression.  (R. 388, 434.)  Impressions from a view of Plaintiff's thoracic spine taken on May 28, 2020 were as follows:

1) 36 degrees levoscoliosis centered at L2-3.
2) 9 mm subluxation of L3 to the left of L4.
3) Marked disc space narrowing on the right at L1-2, L2-3, and L3-4.
4) Status post gastric surgery.

(R. 389.)

A view of her lumbar spine also taken on May 28, 2020 resulted in the following

impressions:

1) 36 degrees levoscoliosis centered at L2-3 with marked disc space
   narrowing on the right at L1-2, L2-3, and L3-4.
2) 9 mm subluxation of L3 to the left of L4.
3) Status post interbody fusion at the L5-S1 level.
4) Status post gastric surgery, probably a bariatric procedure.
5) The sacroiliac joints and hip joints are normal in appearance.

(R. 390.)

On June 3, 2020, Dr. Mehbod wrote to Plaintiff regarding his review of the May

28, 2020 x-rays.  (R. 422.)  Dr. Mehbod stated that Plaintiff's scoliosis was around 38

degrees; he did not see any evidence of any significant sagittal imbalance, which meant

that Plaintiff had "pretty good" balance in the front and side views; Plaintiff had an "area

of the fusion that ha[d] not healed very well at the L5-S1 level"; she had differential

degrees of the slippage of the vertebrae; and surgery was to be performed if Plaintiff's

pain began to interfere with the quality of her life, which would result in extending her

fusion up into her upper back to straighten her spine to free up her nerves.  (R. 422.)

While Plaintiff began taking duloxetine[8] 60 mg at an unspecified date, on July 21, 2020, Dr. Thiessen reported that she stopped taking the medication because "it was not helpful and her anxiety has increased." (R. 451.) Plaintiff did not want to take duloxetine "anymore and 'blow up like a puffer'"; instead, she wanted to restart venlafaxine. (R. 451.) She was having more pain with standing/walking and had been sleeping on a heating pad for 3-4 months to relieve her back pain. (R. 447, 451.)

As of August 14, 2020, Plaintiff was "having stable anxiety and mood." (R. 447.) Dr. Thiessen refilled her venlafaxine, 150 mg once daily, and lorazepam, 0.5 mg as needed, 3 times a day. (R. 449.)

During an October 9, 2020 visit with Dr. Thiessen, Plaintiff reported increased back pain with walking/standing, lower/mid back pain that radiated "down the outside of the thigh, all around the knee and outside of the shin to the ankle left leg," and that she needed to sit down every couple of minutes for relief. (R. 609.) A month later, she complained of worsened pain in her feet/toes, back, and hip, and reported falling while doing stretches "for her IT band." (R. 605.)

On December 3, 2020, Plaintiff reported "a couple of recent falls," stated that movement and weightbearing caused her extreme pain, and was using a cane. (R. 601.) Dr. Thiessen's December 7, 2020 notes indicate that Plaintiff had no falls since the past Thursday, she was fatigued after standing to shower, reported "some irritability and

---

[8]    Duloxetine "is used to treat depression and anxiety." *Duloxetine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 (last visited November 16, 2023).

snapping at people and wonders if this could be due to the prednisone[9]," and she was using a cane for ambulation. (R. 597.)

As of January 5, 2021, Plaintiff continued to have gradually "worsening pain along with left knee injury," making her switch her in-person visit to a "televisit." (R. 593.) Dr. Thiessen's January 5, 2021 notes indicate that Plaintiff tried "duloxetine in the summer and she found that 2 months of that was not particularly effective." (R. 593.)

Dr. Thiessen's February 2, 2021 notes from a medication management appointment show Plaintiff had continued left knee pain, had fallen 3 times in the past 10 weeks, and she reported a left foot/ankle lesion for the past 2 weeks. (R. 651.) She was to consider using a left knee brace. (R. 655.) Her GAD-7 score was 15, indicating moderate anxiety; and her PHQ-9 score was 9, indicating mild depression. (R. 651.) The notes also indicate that her venlafaxine dose would be decreased to 75mg once daily given an increase in the dosage of Savella[10] (her fibromyalgia medication), with direction to follow up in 2 weeks to check on her knee and "look at anxiety/mood options like sertraline." (R. 655.)

---

[9]     Prednisone "provides relief for inflamed areas of the body. It is used to treat a number of different conditions, such as inflammation (swelling), severe allergies, adrenal problems, arthritis, asthma, blood or bone marrow problems, endocrine problems, eye or vision problems, stomach or bowel problems, lupus, skin conditions, kidney problems, ulcerative colitis, and flare-ups of multiple sclerosis." *Prednisone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/side-effects/drg-20075269?p=1 (last visited November 16, 2023).

[10]    Savella is a brand name drug of milnacipran and "is used to treat a condition called fibromyalgia, which causes muscle pain and stiffness." *Milnacipran (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/milnacipran-oral-route/description/drg-20072479 (last visited November 16, 2023).

On February 15, 2021, Dr. Mehbod reported that Plaintiff continued to have back, leg, and bilateral hip pain following her ALIF in May 2019 and that her MRI scan and x-rays showed worsened disc degeneration and spinal canal narrowing at L4-5 with foraminal narrowing at L4-5 in comparison to the MRI scan obtained in 2018.  (R. 671.) The plan was to obtain a new MRI scan and x-rays of her lumbar spine before considering surgery, which were taken in late February 2021.  (R. 619, R. 621-31, R. 671.)  The March 8, 2021 results of the MRI scan showed a left paracentral disc herniation with an extruded fragment at the L4-5 level.  (R. 670.)  The MRI also showed that "The facet arthritis is moderate to severe.  The neuroforaminal stenosis is moderate to severe on the left side.  At the L3-4 level, which is the level above that, [she] ha[d] further spinal canal stenosis and facet arthritis."  (R 670.)  Dr. Mehbod informed Plaintiff that her options included continuing nonoperative care, "however if you think your symptoms are bad enough, then we can do the surgery."  (R. 670.)

As of March 4, 2021, Plaintiff had worse left-sided back, hip, and knee pain.  (R. 647.)  On April 6, 2021, Plaintiff reported a tripping accident while using her cane that occurred a week from the prior Saturday.  (R. 683.)  She also reported continuous constant pain in her left knee and hip.  (R. 683.)  Dr. Thiessen's notes from that visit indicate surgery at Twin Cities Spine Center was delayed because Plaintiff had not yet engaged in supervised physical therapy, which was required at least 2 weeks prior to surgery.  (R. 683.)  A physical therapy referral had been made.  (R. 683.)

On May 4, 2021, Dr. Thiessen reported that Plaintiff had begun physical therapy and that she had a fall a week before as she tripped over her cane while entering her

home.  (R. 722.)  As of July 5, 2021, Plaintiff had 2 falls since her last visit in June 2021 and reported left hip and knee pain with the feeling of instability.  (R. 715.)  Dr. Thiessen's August 3, 2021 notes show Plaintiff had another fall the prior Thursday.  (R. 711.)

As of her next visit on September 23, 2021, Plaintiff had fallen 3 more times, tripping over her left foot, and was referred to a prosthetist to discuss orthotics.  (R. 704, 709.)  She reported experiencing increased anxiety and socially isolating more due to anxiety and pain on September 23, 2021.  (R. 704, 706.)  Dr. Thiessen's notes show she resumed taking venlafaxine 150 mg as of May 4, 2021, which was increased to 225 mg as of September 23, 2021, and she was prescribed lorazepam 0.5 mg up to 3 times daily, but was not taking it or was taking according to her timing.  (R. 700, 705, 708, 715, 719, 722.)  She was also started on buspirone,[11] 15 mg twice daily, on September 23, 2021, and was to follow up in 2 weeks regarding her anxiety.  (R. 700, 708.)

As of her last visit of record on October 21, 2021, Plaintiff reported a fall with injury that occurred on October 13, 2021, where she "tripped over her foot while inside, took a step backwards and fell on her left shoulder with her pelvis twisted to the right shoulder against a door frame."  (R. 700.)  She complained of a urinary incontinence since that fall when standing to walk to the bathroom, as well as worsening constipation.

---

[11]    Buspirone "is used to treat certain anxiety disorders or to relieve the symptoms of anxiety.  However, buspirone usually is not used for anxiety or tension caused by the stress of everyday life."  *Buspirone (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/ buspirone-oral-route/description/drg-20062457 (last visited November 16, 2023).

(R. 700.)  She also complained of burning pain in her mid-back, right shoulder, and lower lumbar across her back with radiation into her mid-thoracic area that worsened since the fall.  (R. 700.)  Dr. Thiessen's notes from that visit reference an x-ray performed on Plaintiff's lumbar spine at an unspecified time which showed "[s]coliosis with fusion hardware and narrowing of L3-4 disc space" and a "[c]ompression fracture with anterior wedging at T12."  (R. 702.)  Dr. Thiessen refilled Plaintiff's lorazepam prescription at 0.5 mg and directed her to set up a video visit in 2 weeks for her anxiety.  (R. 702.)

From the May 19, 2019 alleged onset date to Plaintiff's last visit of record on October 21, 2021, Dr. Thiessen often described Plaintiff as pleasant, in no acute distress, alert, oriented, and cooperative on general examination.  (*E.g.*, R. 448, 452, 461, 464, 594, 598, 602, 607, 610, 649, 653, 685, 702, 706, 713, 717, 720, 724.)

**B.     Dr. Schafer's Psychological Consultative Evaluation Report**

On December 20, 2020, Plaintiff met by video with Ryan Schafer, Psy.D., for a psychological consultative evaluation.  (R. 579.)  During that evaluation, Plaintiff reported that she had undergone back surgery in May 2019, had problems with both sides of her back and numerous orthopedic surgeries, she tripped "all the time," and had "anxiety due to falling a lot and fear of falling and onset in 2013 with panic attacks."  (R. 580.)  She reported that her panic attacks occurred once a month and she was taking lorazepam as needed.  (R. 580.)  Plaintiff also reported having undergone surgery while in junior high school due to one leg growing faster than the other, reported a diagnosis of unspecified depressive type as well as counseling and therapy in 2003 with no ongoing therapy as of the time of the evaluation, and stated that her doctors intended to perform a

spinal fusion at an unspecified time.  (R. 580.)  Plaintiff reported also taking venlafaxine, along with methocarbamol[12] and gabapentin[13].  (R. 580.)  Further, Plaintiff stated that she became unemployed in March 2019 "due to calling in sick," noting it was "physically difficult to work."  (R. 580.)

As to her current level of daily functioning, Plaintiff reported going on pontoon rides during the summers and that she used to ride snowmobiles and ATVs, but was now "limited due to back pain."  (R. 581.)  She also reported the following daily activities: "[W]aking up around 7-8am.  She will get up and watch TV.  [She] will go back to bed and rest.  She indicated that if she is asleep, she does not have pain.  [She] will get up and go to her chair for the day."  (R. 581.)  She had a "hard time" standing in the shower and had obtained a shower chair; physically had a hard time shopping; she had the ability to manage her medications and finances; she "slowly" cleaned her house; could prepare "simple meals"; could drive; lived with her boyfriend; and had limited support from others.  (R. 581-82.)

Plaintiff was cooperative during her mental status examination.  (R. 582.)  She was alert and oriented to all spheres, had appropriate eye contact and intact memory but

---

[12]     "Methocarbamol is used to relieve the discomfort caused by acute (short-term), painful muscle or bone conditions."  *Methocarbamol (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/methocarbamol-oral-route/description/drg-20071962 (last visited November 16, 2023).

[13]     "Gabapentin is used to help control partial seizures (convulsions) in the treatment of epilepsy . . . and relieve pain for certain conditions in the nervous system," but "not used for routine pain caused by minor injuries or arthritis."  *Gabapentin (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited November 16, 2023).

"some difficulty with concentration and attention tasks," did not exhibit restlessness or hyperactivity, had average energy level, appeared to be in pain with a pain level of 6 out of 10 reported, and was lying in bed during the examination.  (R. 582.)  She reported pain in her hips, back, and lower extremities.  (R. 582.)  Her mood was depressed and her affect was congruent to content.  (R. 582.)  She denied suicidal and homicidal ideations.  (R. 582.)  Plaintiff had organized, coherent, and logical thought processes.  (R. 582.)

The "mini-mental status" examination administered by Dr. Schafer was used "as a brief screening for orientation[,] immediate and delayed memory recall, attention, language, and visual-spatial ability."  (R. 582.)  Dr. Schafer noted that Plaintiff reported the mental ability to complete activities of daily living, although she reported physical limitations in completing activities.  (R. 583.)  She also "reported difficulty to work due to physical limitations and not mental health diagnosis."  (R. 583.)  Dr. Schafer's diagnostic impressions of Plaintiff were generalized anxiety disorder by history and an unspecified depressive disorder.  (R. 583.)  Dr. Schafer stated that Plaintiff had the ability to understand, retain information and follow simple directions; to mentally concentrate and persist at a reasonable place; and "have superficial contact with coworkers and supervisors."  (R. 583-84.)  He opined that "[m]entally," Plaintiff had "the ability to handle entry level workplace stress."  (R. 584.)

C.    **Mr. Carroll's Psychological Consultative Evaluation Report**

On April 28, 2021, Patrick J. Carroll, MA, LP, performed a remote consultative mental status examination on Plaintiff, noting Plaintiff's primary problems were chronic back and joint problems that had occurred for most of her life resulting from injuries and

scoliosis.  (R. 689.)  Mr. Carroll reviewed background information provided by the Social

Security Administration ("SSA") as well as Plaintiff's activities of daily living.  (R. 689.)

Mr. Carroll[14] noted that Plaintiff did not appear to have any trouble understanding or

following through with requests, related fairly well to him, was conversational, and was

emotional in relating her story as she cried "a couple of times."  (R. 689.)  She had no

issues logging on to the "teleconference."[15]  (R. 689.)

When questioned about why she felt disabled, Plaintiff primarily discussed her

back pain, joint problems, and falling and tripping frequently because of her hammer toes

and difficulties following surgical interventions.  (R. 690.)  She described having anxiety

and depression since 2003.  (R. 690.)  She said she was fired from her last job as a

pharmacy assistant because "she could no longer perform the physical tasks required in

that job" and was calling in sick.  (R. 690-91.)  She had been on "a number of

medications for both her physical health problems and for her mental health issues" and

needed to have surgery because the disc fusion surgery she had in 2019 was not

successful.  (R. 690.)  She had previously engaged in physical therapy, which was

helpful.  (R. 690.)  At age 13, she "started to act out at home and was ultimately placed

on a mental health unit for a short period of time."  (R. 690.)

---

[14]     The ALJ refers to this expert as "Dr. Carroll" (*e.g.*, R. 18), but the Court uses "Mr. Carroll" as the expert has an MA degree, not a PhD or MD (*see* R. 693).

[15]     Mr. Carroll reported that Plaintiff was "neatly dressed in casual clothes" and "neat and clean" (R. 689), so it appears the examination was by videoconference.

As to her level of daily functioning, Plaintiff did not identify anything that she did that was "fun," noting that she mostly stayed home and "never" went out because of her pain and anxiety. (R. 691.) She reported falls "because of her physical health problems and she doesn't want to fall in public" and was unable to "stand for more than five minutes before being in significant pain and that fact limits the things she can do around the house." (R. 691.) She spent a lot of "her day sitting in her recliner," rated her average pain level at an 8 out of 10, reduced to 6 for about 2 hours after taking pain medications, but increased after trips and falls, and "estimated that she can stand for no more than 5 minutes and can sit for 30 minutes before she has to get up and move." (R. 691-92.) Plaintiff noted being able to "make and maintain friendships," although, she seldom left the house. (R. 692.) She got along well with coworkers. (R. 692.) Her relationship with her partner was strained due to financial issues arising from her inability to work. (R. 692.)

Mr. Carroll stated that Plaintiff appeared physically uncomfortable and showed signs of being in physical pain during the mental status examination, rating her pain level at the time at an 8 out of 10. (R. 692.) Her thought process seemed logical and goal directed, her mood was euthymic, she was well oriented in all spheres, and her concentration and attention were adequate although she had problems with focus and attention when in pain. (R. 692-93.) Mr. Carroll ultimately opined as follows:

> It is my opinion, based on this interview, that [Plaintiff] has the capacity to understand and remember instructions that would be a part of an entry-level work position. The pace of her work would be slow. She would probably be able to interact with fellow workers. At this time she may need some accommodation as she learns to handle the stress and pressure of a new job.

Her physical health problems will interfere with her ability to bend, stoop, lift etc. Her anxiety will cause her to worry about falling and make her very self-conscious.

(R. 693.)

### D.    Dr. Kachgal's Opinion at the Initial Level

On January 13, 2021, Mera Kachgal, PhD, LP, opined at the initial level that Plaintiff's mental impairments were severe anxiety and depressive disorder.  (R. 71, 91.) Dr. Kachgal listed Plaintiff's criteria B listings as "moderate" in interacting with others and "mild" in her ability to concentrate, persist, or maintain pace.  (R. 71, 91.)  Dr. Kachgal noted that the evidence did not establish the presence of the "C" criteria of the listings.  (R. 71, 91.)

As to Plaintiff's mental RFC, Dr. Kachgal opined that Plaintiff did not have any limitations in understanding and memory or sustained concentration and persistence, but was moderately limited in her ability to interact appropriately with the general public as well as accept instructions and responding appropriately to criticism from supervisors. (R. 76-77, 96-97.)  Dr. Kachgal opined that Plaintiff did not have significant limitations in her abilities to: ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (R. 77, 97.)  According to Dr. Kachgal, Plaintiff retained "the ability to tolerate superficial interactions with coworkers and supervisors," "would do best without regular public contacts," and had "reported panic attacks."  (R. 77, 97.)  When describing Plaintiff's examination by Dr. Schafer, Dr. Kachgal noted that the monthly panic attacks were not

22

corroborated, "but she has been taking Lorazepam and Duloxetine for years." (R. 72, 78, 92, 97.) Dr. Kachgal explained Plaintiff's social interaction capacities as follows: "She retains the ability to tolerate superficial interactions with coworkers and supervisors. She would do best without regular public contacts. She reported panic attacks." (R. 77, 97.)

## E.    Dr. Kuhlman's Opinion at the Reconsideration Level

On May 10, 2021, Thomas Kuhlman, PhD, LP, opined at the reconsideration level that Plaintiff had anxiety and depressive disorders. (R. 112, 122.) As to criteria "B" listings, Dr. Kuhlman stated that Plaintiff was mildly limited in her abilities to interact with others and moderately limited in her ability to concentrate, persist, or maintain pace. (R. 112, 122.) Dr. Kuhlman noted that the evidence did not establish the presence of the "C" criteria of the listings. (R. 112, 122.) Dr. Kuhlman stated that Plaintiff benefited from medication, did not have a serious and persistent mental illness, and her severe functional limitations were primarily attributable to her severe physical impairments. (R. 113, 123.) According to Dr. Kuhlman, Plaintiff had "severe mental impairment but not so severe as to meet or equal any of the mental listings." (R 113, 123.)

As to Plaintiff's mental RFC, Dr. Kuhlman opined that Plaintiff had sustained concentration and persistence limitations, resulting in her being moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 115, 125.) Dr. Kuhlman opined that Plaintiff was not significantly limited in her abilities to: carry out very short, simple, and detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary

tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions.  (R. 115, 125.)  Dr. Kuhlman further opined that Plaintiff could "sustain mental effort to [substantial gainful activity] levels of productivity in the performance of detailed work tasks which are routine and repetitive."  (R. 115, 125 (bold omitted).)  According to Dr. Kuhlman, Plaintiff had no social interaction limitations.  (R. 115, 125.)  Dr. Kuhlman stated that Plaintiff could "adapt to workplace changes and stressors which do not unduly tax her mental limitations indicated above."  (R. 116, 125-26 (bold omitted).)

**F.      Plaintiff's Disability Reports**

In a November 12, 2020 Adult Disability Report, Plaintiff listed the following physical and mental conditions that limit her ability to work: chronic pain, fibromyalgia, lumbosacral radiculopathy, bilateral leg edema, bad back – back surgery (poor fusion), anxiety, depression, "DDD," spinal stenosis, and scoliosis, noting that her conditions caused pain or other symptoms.  (R. 267.)  She listed the following medications for anxiety: duloxetine and lorazepam.  (R. 269-70.)  Plaintiff stated that she visited Mercy Hospital for "[e]valuation, post concussion issues" and stated it was "[h]ard to leave the house due to anxiety."  (R. 271.)

On February 4, 2021, Plaintiff completed a Disability Report-Appeal, indicating a change in her medical conditions in 2020 due to her falling and injuring herself, leading her to need a cane "most of the time."  (R. 292.)  She visited Twin Cities Spine Center in the fall of 2020 for surgery consultation and had MRI and CT scans of her back.  (R. 293-

94.)  As of that time, Plaintiff was taking various medications, including duloxetine for anxiety and nerve pain, lorazepam for anxiety, and Savella for anxiety and depression. (R. 295.)  Plaintiff stated that she was unable to "do daily activities, [could not] stand or walk for very long, and struggle[d] with cooking meals, doing dishes, and cleaning her home."  (R. 296.)

In an Adult Function Report completed by Plaintiff on March 4, 2021, she stated that she lived with her partner (sometimes referred to as her boyfriend in the record).  (R. 307.)  Plaintiff stated that her conditions limit her ability to work as she was unable to stand or walk for more than 3 to 5 minutes with the use of a cane, she used a shower chair due to fatigue but still had a "hard time even with the use of it," she lacked energy to do anything else, her anxiety kept her from leaving the house and she did not sleep well due to anxiety and pain, she had balance issues and fell "a lot," and she had lost her most recent employment due to "these issues."  (R. 307.)  As to her daily activities, Plaintiff stated that she would:

> [W]ake up, take medications, watch TV. Eat something around 1-2:00 pm, maybe try and do dishes or something light, maybe 2-3 times [per] week if feeling able. Sleep if I can. More medication (this is 4xday) more TV. Something for dinner, I do love to cook but can't do it much. More TV and off to bed, times vary depending on how tired I'm feeling. I tend to try to sleep in.

(R. 308.)

She would let the dog outside 2 to 3 times per day.  (R. 308.)  Prior to her conditions, Plaintiff was able to bake, cook, participate in motor sports, go out in public, and have fun.  (R. 308.)  She was unable to sleep for more than 3 to 5 hours at a time,

which made her tired all the time.  (R. 308.)  Due to her conditions, while Plaintiff was able to dress herself, she did so slowly; it took her between an hour and an hour and a half to shower; she usually put her hair in a ponytail due to "bad shoulders"; she did not shave much anymore; she was able to feed herself; and could use the toilet although it was hard to stand up and she used the sink and toilet "for help."  (R. 308.)

Plaintiff used a timer for medication reminders and prepared "real meals" about 2-3 times per week depending on her pain level, which took between an hour and an hour and a half to prepare with breaks.  (R. 309.)  Otherwise she made toast, cottage cheese, "leftovers, if I was able to make a hot dish or ?", and meat and potatoes, "if able."  (R. 309.)  She was able to clean and do laundry "a little at a time," which was all she could do as to indoors and outdoors chores, and it was an "ongoing process" because she "never finish[ed] anything in a single day."  (R. 309.)  Her partner helped with most of the household chores and "[did] a lot for" her.  (R. 309.)  She did "not go 'out' because of [her] history of falling and [she] can't get up on [her] own usually."  (R. 310.)  She traveled by driving or riding in a car and preferred not to go out alone, but did so at least once a month.  (R. 310.)  Plaintiff shopped by phone, computers, and in stores by herself for groceries about once every 2-3 weeks, which took 2-3 hours (not including travel time).  (R. 310-11.)  Plaintiff was unable to pay bills due to not working but could count change.  (R. 310.)  Her hobbies and interests included "just TV [all the time], cooking [2-3 times and not nearly as well], when feeling I can, same with baking [very limited]."  (R. 311.)  Prior to her conditions, Plaintiff cooked "far more advanced type meals" for dinner and baked several times a week, which took half the time as it did her since her

conditions, and before her conditions, she "was always the to go to [sic] for birthdays and holidays for cakes, deserts etc." (R. 311.) She spent time with others by texting and in person, had friends stop over to chat once to twice per week, and she went to lunch/dinner with friends about once every month or two. (R. 311.) Plaintiff stated that she had no problems getting along with family, friends, neighbors, or others. (R. 311.) She no longer engaged in social activities since her conditions. (R. 311.)

Plaintiff noted that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, as well as her memory. (R. 312.) Her conditions did not affect her ability to talk, hear, see, understand, follow instructions, use her hands, or get along with others, and she finished things she started with breaks. (R. 312.) She could walk 100 feet before needing to stop and rest and "usually ha[d] to sit for 2-3 min[utes] to have [her] back muscles relax/unlock." (R. 312.) She could pay attention for about 5 to 10 minutes if around others but had no attention issues if alone. (R. 312.) Plaintiff got along with authority figures "perfect" and had never been fired or laid off from a job because of problems getting along with other people. (R. 312.) She did not "like leaving [her] home very often [and] worr[ied] about a lot of things!" (R. 313.) Plaintiff used a cane, which was prescribed to her in May 2019 after her last back surgery, which she utilized when "walking more than across the house." (R. 313.) Plaintiff attached a medication list dated March 4, 2021, which she annotated to indicate she was now taking Savella 100 mg twice daily (instead of the Savella titration pack) and she was taking lorazepam. (R. 315.)

G.      **Third-Party Function Report of Scott A. K.**

On March 30, 2021, Scott A. K., Plaintiff's partner completed a Third-Party

Function Report, stating that he had known Plaintiff for 25 years and that they spent 16

hours together each day watching TV, eating, talking, and sleeping.  (R. 317.)  Scott A.

K. stated that Plaintiff had no "routine schedule of sleep/wake hours[,] wakes in pain –

watches TV" and engaged in "[m]inimal activity[,] minimal cleaning, laundry, minimal

cooking – baking."  (R. 318.)  Plaintiff did not take care of anyone else but had a dog that

she let out and fed, and that Scott A. K. assisted with caring for.  (R. 318.)  Scott A.K.

claimed that prior to Plaintiff's conditions, she was able to "work in or outside of home,"

but now could not "work to earn money"; was previously "able to do housekeeping,

gardening, cleaning, shopping" but now could not engage in those activities, and

previously enjoyed boating, ATV, snowmobiles, hiking, gardening, but now could not do

those things."  (R. 318.)  Scott A.K. stated that Plaintiff found it "very difficult" to dress

(especially socks/shoes), bathe (because she could not stand and used a shower chair),

care for her hair, and shave.  (R. 318.)  He further stated that Plaintiff found it

challenging to use the toilet, although she was able to do so, and that she found it difficult

to cook, clean, and do laundry, although, she could feed herself.  (R. 318.)  Plaintiff

needed reminders with bathing.  (R. 319.)  Plaintiff could cook on some days but was

unable to do so on other days at which time she prepared "easy" meals like frozen meals,

pizza, BLT, and mac-n-cheese, for 2 hours, 4 to 5 nights per week.  (R. 319.)  When

asked whether Plaintiff's cooking habits had changed since her conditions, Scott A. K.

stated "Absolutely! She used to love to cook" but could no longer "stand, mix, fry for

more than 5 minutes." (R. 319.) Scott. A. K. stated that with encouragement, Plaintiff did "minimal" inside household chores, including cleaning and laundry, but could not load and unload the dishwasher due to pain, and could not perform any outdoor chores (including yard work) due to pain, exhaustion, and feeling defeated and depressed. (R. 319-20.)

According to Scott A. K., Plaintiff did not go outside often because she was afraid of falling. (R. 320.) Plaintiff rode in a car when going out and went out alone "very seldom only if absolutely necessary." (R. 320.) Scott A.K. did "almost all" the shopping and paid all necessary bills. (R. 320.) Plaintiff "very seldom" shopped. (R. 320.) Plaintiff's hobbies/interests included watching TV. (R. 321.) Plaintiff spent time with others on the phone only once a week, did not do anything with others or go anywhere on a regular basis, and had no problems getting along with family, friends, neighbors, or others. (R. 321-22.) Prior to her conditions, she "was active in motorsports (ATV, snowmobiles, off road)" and "loved gardening, planting, cooking." (R. 321.) According to Scott A. K., Plaintiff's conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, and get along with others, but did not affect her ability to talk, hear, see, use her hands, or her memory. (R. 322.) Plaintiff could walk with a cane or walker for 100 feet "very slowly" before needing to rest. (R. 322.) She could pay attention for 1 to 2 hours per day. (R. 322.) She did not follow written or spoken instructions well and could be defiant/argumentative. (R. 322.) Plaintiff "has always been fine" with getting along with authority figures, although, she had no authority figures in her life as of the time he

completed the report; had never been fired or laid off from a job due to problems with

getting along with other people; and did not handle stress well as she could be very

anxious and got "crabby and upset when in stressful situations." (R. 322-23.) Scott A.

K. noticed an unusual behavior or fear in Plaintiff including that she "fears that how she

is living now will be how she lives the rest of her life – in pain and uncomfortable." (R.

323.) Plaintiff used a cane, walker, glasses, and a brace every day, although, according to

Scott A.K., only the brace and glasses were prescribed to her. (R. 323.)

## H.    Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff testified that prior to her back surgery in

May 2019, she had nerve pain down the back of her left leg and into her left foot and in

her back, resulting in her not being able to walk or stand for very long. (R. 41-42.) The

pain worsened, leading to her calling in sick at work, resulting in her getting fired. (R.

42.) After her back surgery, her big right toe began to go numb and the symptoms she

had experienced on her left side before her surgery were now present on her right side,

and had slowly progressed and worsened. (R. 42.) As of the hearing, she had neuropathy

and weakness from her bilateral waist down to her bilateral feet, as well as tingling and

back pain. (R. 42-43.) Plaintiff also testified that she had issues with falls caused by a

left drop foot, making it difficult to walk and resulting in her starting to use a cane

everyday starting September 2019. (R. 43-44.) She used the cane inside and outside her

home, with standing. (R. 43-44.) She used the cane to steady herself.[16] (R. 44.) She

---

[16]    The ALJ asked Plaintiff "Why do you need it for standing?" (R. 44.) Plaintiff
responded: "Just to steady myself. When I first get up from a chair, or, from a, you

could stand with her cane for less than 5 minutes before needing to sit back down, could walk with the cane about 100 feet, "if that," before needing to take a break, and used a shower chair.  (R. 44-45.)  Plaintiff testified to having left hip arthritis, with additional pain beyond the pain that radiated from her back, and she had bursitis and band syndrome in her left knee with swelling and stiffness making it hard for her to walk.  (R. 45-46.)  She also experienced some swelling in her right leg sometimes and elevated her legs "[a]ll the time."  (R. 46.)  She experienced the pain in her back, hip, knee, and bilateral legs every day and experienced it when on her feet.  (R. 45-46.)

As of the hearing date, due to the Covid-19 pandemic and "everything that's been going on," including "a little mental health problem, to get out of [her] house," Plaintiff had not contacted her doctors regarding the treatment plan for her back.  (R. 46.)  The plan was for her to undergo back surgery, which her insurance company had denied coverage for because it required her to undergo physical therapy prior to surgery.  (R. 46-47.)  Plaintiff had since engaged in some of the required physical therapy, attending 2 of the 8 scheduled appointments, and testified that she had called the scheduler and was waiting for a call back.  (R. 47.)

When Plaintiff engaged in physical therapy for her falls in November 2019, she had experienced issues related to leaving her home due to fear of falling and noted a history of panic attacks for years.  (R 47.)  However, they were "well under control" with medication, although she was missing some of her medication at the time of the hearing

_____

know, from bed, or --."  (R. 44.)  At that point, the ALJ interrupted Plaintiff with "With your cane, how long can you stand before you need to sit back down?"  (R. 44.)

due to not haven gone to the pharmacy.  (R. 47-48.)  She did not go outside her home

"very much anymore."  (R. 44.)  The first time she was to leave her home in a month was

to be the day after the hearing for a doctor's appointment.  (R. 48.)  Her depression had

also worsened post-surgery.  (R. 48.)  Plaintiff testified that her depression, anxiety, and

pain symptoms caused issues with concentration and focus, and she was able to watch

TV for about 20 minutes before getting distracted and having to "get up and move around

a little bit."  (R. 48-49.)

　　　Plaintiff had not attended mental health therapy for her depression and anxiety,

although her doctor "suggest[ed]" she should "see somebody for possibly

agoraphobia[17]."  (R. 49.)  She identified herself as a procrastinator, stating: "I'm afraid

to leave the house because if I have to go to an appointment, and, you know, I get more

appointments.  Well that means I have to leave my house again and I don't want to leave

my house.  I can't leave my house."  (R. 49.)  She was taking lorazepam, buspirone, and

venlafaxine for her anxiety and depression.  (R. 49-50.)  She also testified to difficulties

interacting with others sometimes, leading her to use drive-throughs in order to avoid

people.  (R. 50.)  A typical day for her consisted of: "Absolutely nothing.  I mean I really

do nothing. I don't get out.  I don't even do the dishes half the time at home.  I don't

cook."  (R. 50.)  She explained that her partner worked from 2:00 to 10:30 p.m., so: "I

---

[17]　　　Agoraphobia is the anxiety that occurs when one is in a public or crowded place, from which a potential escape is difficult, or help may not be readily available. It is characterized by the fear that a panic attack or panic-like symptoms may occur in these situations."  https://www.ncbi.nlm.nih.gov/books/NBK554387/ (last visited November 16, 2023).

don't cook -- I'm not cooking, because there's no one here to cook for. And I don't want

to eat at 10:30 at night. So there's nothing for me to do. Plus, I can't stand in front of a

stove to cook anymore." (R. 50.) While she used to be able to do house chores like

cleaning, laundry, grocery shopping, and vacuuming, she was no longer able to do them

due to her back, hips, knees, and inability to walk around the stores and because of her

anxiety. (R. 50-52.)

## I.    Vocational Expert's Testimony

The VE also testified at the administrative hearing. (R. 53.) The VE characterized

Plaintiff's past relevant work as receptionist, manager, and pharmacy tech clerk. (R. 54.)

The ALJ presented the following hypothetical individual of Plaintiff's age and education

with her past relevant work, who could perform sedentary work, and asked the VE

whether the following individual could perform any of Plaintiff's past relevant work:

> The individual would need to use a cane while walking, but not while
> standing in place. The individual may never climb ropes, ladders, or
> scaffolds, and may occasionally climb ramps and stairs, balance, stoop,
> kneel, crouch, and crawl. The individual may have no exposure to
> unprotected heights or hazards as the term hazards is defined in the DOT and
> the SCO.

(R. 54.)

In response, the VE stated that the receptionist job would be available both per the

DOT and as performed. (R. 55.) The ALJ then noted that the receptionist job had not

been performed by Plaintiff with a cane, noted that cane use is not taken into account in

the DOT, and inquired as to what the VE relied on in regard to the use of a cane while

walking. (R. 55.) The VE responded that his testimony regarding the use of a cane while

walking was based on his education, training, and experience, noting that his "experience is that a cane is acceptable for sedentary jobs to ambulate to the position, but not for balancing or standing."  (R. 55-56.)  The ALJ then confirmed with the VE "that would be a distinction."  (R. 56.)

The ALJ presented a second hypothetical individual to the VE with the same limitations as the first hypothetical, and asked whether the individual would be able to perform Plaintiff's past relevant work with the additional limitation of: "performance of simple repetitive tasks."  (R. 56.)  The VE responded no.  (R. 56.)

Plaintiff's counsel inquired as to whether the first hypothetical individual would be able to perform the receptionist job with an additional limitation of "superficial interactions with coworkers and supervisors and no regular public contact," to which the VE responded no.  (R. 57.)  Counsel added an additional limitation to the first hypothetical of "a slowed pace where there would be some time off task," asking "what would be the tolerable allowance for off-task time due to either a slow pace or needing some extra time to learn a new job?"  (R. 58.)  The VE responded that "[a]side from the normal breaks of 15 minutes, two, and one half hour lunch, an employer will typically tolerate up to 10 percent of the workday off task, which equates to six minutes per hour. Anything more than that would be work preclusive."  (R. 58.)

## III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc.*

*Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (quoting *Travis*, 477 F.3d at 1040).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV. DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds.  Plaintiff asserts that the ALJ erred in assessing her medically determinable mental impairments as non-severe and rating her "Criteria B"[18] limitations, "particularly the ALJ's description of [Plaintiff's] 'high level of independence in a wide range of activities of daily living.'" (Dkt. 10 at 19-25 (citing R. 17-18); Dkt. 13 at 2-6.)  Plaintiff also argues that the ALJ erred in failing to comply with Social Security Regulation ("SSR") 96-8p in assessing her RFC, including by failing to account for her use of a cane for balancing and standing;

---

[18]    The Court understands "Criteria B" to mean the same thing as "paragraph B" criteria as used by the ALJ and the Commissioner.  (R. 15; Dkt. 12 at 6.)  The Court uses "Criteria B" and "paragraph B" interchangeably.

failing to account for her subjective complaints of pain, including her pain's effect on her ability to concentrate; dismissing the medical experts' opinions and prior administrative findings; and misrepresenting her daily activities. (Dkt. 10 at 25-33; Dkt. 13 at 6-11.)

The Commissioner responds that the ALJ properly found Plaintiff's mental impairments non-severe at step two and properly considered her mental impairments in crafting the RFC. (Dkt. 12 at 1, 5-11, 15-16.) The Commissioner further argues that Plaintiff has not met her burden of proving severe mental impairments, nor has she shown the need for mental RFC restrictions. (*Id.*) The Commissioner also contends that Plaintiff has not proven physical limitations beyond sedentary work with hazard and postural restrictions and use of a cane while walking but not standing in place, and properly treated her reports of pain. (*Id.* at 11-15.) Finally, the Commissioner argues that the ALJ properly considered the medical experts' opinions and prior administrative findings with respect to the RFC. (*Id.* at 16-18.)

## A.    Plaintiff's Mental Impairments

The Court first addresses Plaintiff's arguments regarding the ALJ's treatment of her mental impairments, beginning with Dr. Schafer's and Mr. Carroll's medical opinions. Pursuant to the applicable regulations, "[an ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, "[w]hen a medical source provides one or more medical opinions or prior administrative medical findings, [the ALJ] will consider those medical opinions or prior administrative medical findings from

that medical source together using" the following factors: (1) supportability,

(2) consistency, (3) relationship with the claimant (including length and purpose of

treatment and frequency of examinations, among other factors), (4) specialization, and

(5) other factors (for example, when a medical source has familiarity with the other

evidence in the claim). 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5).

The most important factors are supportability and consistency, and the ALJ is required to

explain how they considered those factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). An

ALJ is not required to explain the remaining factors set forth in the regulations unless

they "find that two or more medical opinions . . . about the same issue are both equally

well supported . . . and consistent with the record . . . but are not exactly the same." 20

C.F.R. §§ 404.1520c(b)(2)-(3); 416.920c(b)(2)-(3).

Here, the ALJ found Dr. Schafer's and Mr. Carroll's opinions unpersuasive for

several reasons, including because they were conducted by video, were "vague in terms

of whether [the expert] was assessing maximal limits or describing baseline functioning,"

and "[o]verall, the record does not support significant limitations in any of the areas of

mental functioning, given the course of treatment, minimal findings, and high activities

of daily living." ( R. 25.) Several aspects of the ALJ's reasoning give the Court pause

sufficient to require remand.

*First*, the ALJ described the consulting examiners' opinions as based on a

"thorough" examination, which should weigh in favor of finding them persuasive, but

then discounted them because both examinations were "one-time" and based on an

"interview of the claimant by video." (R. 25.) The Eighth Circuit has found that

generally, a single examination by a consulting examiner is not substantial evidence on which an ALJ may base their decision. *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003) (decided when the regulations requiring deference to treating physicians were in effect). However, one of the exceptions to this rule occurs when the consulting examiner's one-time medical assessment is supported by better or more thorough medical evidence. *Id.* at 812-13. Here, Dr. Schafer's examination included detailed findings based on a mini-mental status exam "used as a brief screening for orientation[,] immediate and delayed memory recall, attention, language, and visual-spatial ability." (R. 582-83.) The ALJ's focus on the one-time nature of Dr. Schafer's examination and reliance on "general examination" findings during primary care visits to undermine Dr. Schafer's opinions is concerning. (*E.g.*, R. 16, 17, 22 (all citing Ex. 4F at 10 (R. 448)).)

Moreover, the ALJ did not identify what about the video nature of the interviews impeded Dr. Schafer's and Mr. Carroll's ability to examine Plaintiff. (*See* R. 25.) Dr. Schafer was able to observe Plaintiff's dress, grooming, and hygiene. (R. 579.) He did not identify any portion of the exam that he was unable to conduct because it was not in person, and his report states that he also based his conclusions on "information that was gathered from [Plaintiff]" as well as "behavioral observations, [and] assessments and records that were made available for review at the time of the evaluation." (R. 580; *see also* R. 581 (listing records).) Nothing in the report suggests Dr. Schafer's ability to conduct the examination was hindered by the fact that it was by video.

As to Mr. Carroll, his opinions were based on an interview, a mental status exam, a review of Plaintiff's activities of daily living, and "background information provided by

Social Security." (R. 689.) Similarly, nothing in Mr. Carroll's report suggests that his examination of Plaintiff was hindered by the fact that it was by video. Further, even though the ALJ described Mr. Carroll's opinion as "not persuasive" (R. 25), the ALJ relied on Mr. Carroll's observations and mental status exam results when forming his opinions (*see* R. 16 (ALJ relying on "normal findings" and "euthymic mood" from Mr. Carroll's exam), R. 17 (same), R. 18 (same, and also relying on Dr. Carroll's findings as to concentration, memory, and attention, math skills, fund of knowledge, insight, judgment and apparent intellectual functioning).) The ALJ did not explain how he could rely on Dr. Carroll's observations and exam findings made by video while simultaneously discounting Dr. Carroll's opinion because the examination was taken by video.

Further, in contrast to the ALJ's treatment of Dr. Schafer's and Mr. Carroll's video exams, the ALJ was content to rely on "telehealth" visits to support his conclusion as to **physical** limitations—which reasonably might be more difficult to evaluate by video—specifically that Plaintiff had "no problems with standing" because the telehealth visits "overall . . . have not shown substantial neurological losses and do not support the inability to stand without an assistive device." (R. 21; *see also* R. 24 ("While the exam findings have been limited, most of the treatment visits during the claim period have been by telehealth and have shown issues with gait most of the time despite this").) Even more troubling, the ALJ cited a single in-person medical record (a January 16, 2020 office visit with PAC Eckroth) for his conclusions as to Plaintiff's ability to stand (R. 21 (citing "Ex. 3F, at 14 14", which is the first page of R. 428-30)) and then relied on

unspecified "telehealth" visits to support his "overall" conclusions. (R. 21, R. 24.) Many of Plaintiff's "telehealth" visits were by phone without video, calling into question the ALJ's reliance on them for purposes of gait, strength, and balance observations. (*See, e.g.*, R. 423 (May 21, 2020 visit "over the telephone"), R. 593-95 (January 5, 2021 by "only telephone communications without video" due to Plaintiff's knee pain and lack of hot water for bathing), R. 597-99 (December 7, 2020 visit by "only telephone communication without video"), R. 601-603 (December 3, 2020 visit by same), R. 605-07 (November 9, 2020 visit by same), R. 601-11 (October 9, 2020 visit by same), R. 647-49 (May 4, 2021 visit by same)). The Court will address the ALJ's reliance on telephonic visits to draw conclusions as to gait, strength, and balance in Section IV.B. Suffice to say, for purposes of Plaintiff's mental limitations, the Court cannot find the ALJ's decision to discount Dr. Schafer's and Mr. Carroll's opinions in part because they performed the examinations by video (R. 25) supported by substantial evidence because the ALJ's rationale for doing so is unexplained, particularly when the ALJ relied on findings from those exams and treated "telehealth" visits more favorably. This warrants remand. *See Weber v. Colvin*, No. 16-CV-332 (JNE/TNL), 2017 WL 477099, at *26 (D. Minn. Jan. 26, 2017) ("The Court is not able to determine whether there is substantial evidence in the record as a whole to support the ALJ's conclusion at step three when the ALJ has not explained adequately the evidence relied upon in determining that Plaintiff did not meet listing 12.04."), *R. & R. adopted sub nom.*, 2017 WL 448297 (D. Minn. Feb. 2, 2017).

***Second***, the ALJ also discounted both Dr. Schafer's and Mr. Carroll's "conclusions" as "vague in terms of whether" they were "assessing maximal limits or describing baseline functioning."  (R. 25.)  The Court does not discern anything in either report suggesting that they were describing "baseline functioning," that is, that Plaintiff could do more than the consulting examiners found in the Medical Source Statement portion of their reports, instead of Plaintiff's "maximal limits."  Nevertheless, if the ALJ was confused about this discrete issue, the ALJ should have clarified this issue.  *See Julie B. v. Kijakazi*, No. CV BPG-21-933, 2022 WL 20651517, at *2 (D. Md. Mar. 4, 2022) (reversing and remanding where "ALJ stated 'given that the consultative examiner only found normal findings on physical examination, as discussed above including five out of five strength throughout, it is unclear if these 20 pounds is the maximum amount plaintiff could lift and carry,'" and found no severe impairment at step 2 without "attempting to clarify this finding").

***Third***, the ALJ apparently questioned whether Plaintiff had experienced panic attacks after the alleged onset date, stating three times: "She attended a video consultative examination [with Dr. Schafer] on December 20, 2020, and presented a driver's license for identification (Ex. 8F).  She complained of monthly panic attacks, **which the examiner noted were not corroborated**."  (R. 17, 18, 22 (emphasis added) (citing Dr. Schafer's report at Exhibit 8F).)  To be clear, Dr. Schafer did not note that Plaintiff's panic attacks were not corroborated.  Rather, he said:

- "Claimant reported anxiety due to falling a lot and fear of falling and onset in 2013 with panic attacks." (R. 580);

- "Claimant reported having panic attacks once a month and indicated taking lorazepam as needed." (R. 580); and

- "Claimant reported anxiety due to falling a lot and fear of falling and onset in 2013 with panic attacks. She reported tripping all the time. Claimant reported having panic attacks once a month and indicated taking lorazepam as needed." (R. 583).

Mr. Carroll also did not say Plaintiff's panic attacks were not corroborated. His summary and diagnostic impression included "unspecified anxiety disorder with panic attacks." (R. 693 (capitalization altered).)

Rather, the "not corroborated" language relied on by the ALJ is found in Dr. Kachgal's administrative findings as part of the initial determination. (R. 72, R. 77, R. 92, R. 97.) Dr. Kachgal noted that Plaintiff's reports of panic attacks to Dr. Schafer were "not corroborated" (R. 72, R. 78, R. 92, R. 97), but twice continued: "There is no corroboration of panic attacks, but she has been taking Lorazepam and Duloxetine for years" (R. 78, R. 97). However, the ALJ ignored this explanation when finding Plaintiff's anxiety non-severe (R. 17, R. 18), indicating the ALJ believed Dr. Kachgal doubted the panic attacks were real. Worse yet, the ALJ ignored the fact that Dr. Kachgal referenced them when finding Plaintiff's social interaction capacities and limitations were moderately limited with respect to interacting appropriately with the general public and accepting instructions and responding appropriately to criticism from supervisors. (R. 77 ("She retains the ability to tolerate superficial interactions with coworkers and supervisors. She would do best without regular public contacts. She reported panic attacks."), R. 97 (same).) To the extent the ALJ concluded there was no evidence to support panic attacks based on Dr. Kachgal's statement that they were "not

corroborated," that conclusion is not supported by substantial evidence, given that Dr. Kachgal noted in connection with the panic attacks that Plaintiff was taking anti-anxiety medication and assessed Plaintiff with certain mental limitations based in part on the panic attacks, indicating that Dr. Kachgal did not question whether Plaintiff did experience panic attacks. Further, no other provider or medical professional questioned whether Plaintiff experienced panic attacks.

*Fourth*, the ALJ relied on the fact that Plaintiff had not undergone counseling or therapy since 2003 when concluding her mental limitations were non-severe. (R. 16, 18-20.) Plaintiff argues that "[t]he ALJ erred in failing to consider the reason for Ms. Larsen's lack of mental health therapy" and in not considering the fact that Plaintiff missed physical therapy appointments due to anxiety. (Dkt. 10 at 21-22.) Plaintiff argues that the regulations preclude an ALJ from drawing inferences about a claimant's symptoms and RFC from a failure to seek or pursue regular medical treatment without first considering any explanations that the claimant may provide, or other information in the record, that may explain the lack of treatment. (*Id.* at 22.) The Commissioner responds: "To the extent that Plaintiff reported anxiety due to her physical impairments, such situational stressors are not disabling" (Dkt. 12 at 7), to which Plaintiff replied: "The Commissioner's post hoc argument that [Plaintiff's] anxiety resulted from situational stressors is not persuasive" (Dkt. 13 at 2).

As an initial matter, the Court rejects the Commissioner's "situational" argument. The ALJ never discounted Plaintiff's anxiety as due to situational stressors, and in fact, Plaintiff had been on anti-anxiety medication for years before her alleged onset date of

May 6, 2019. (*See* R. 534, 537, 568-69, 615-16, 638.) Moreover, the Court may not accept or manufacture post hoc rationales for the ALJ's decisions. *Ronald V. v. Kijakazi*, No. 22-CV-2140 (TNL), 2023 WL 6318276, at *6 (D. Minn. Sept. 28, 2023) ("[T]he ALJ's decision cannot be sustained on the basis of the post-hoc rationalizations of appellate counsel.") (collecting cases).

Even if it were not a post-hoc argument, the Court would still reject the "situational stressors" argument. In addition to Plaintiff's pre-onset history of anxiety, Plaintiff expressed anxiety specifically about leaving the house due to her concerns about falling. (*See* R. 307, 313, 320, 397, 403, 580, 583, 691-92; *see also* R. 400 (Plaintiff reporting at November 2019 physical therapy appointment that she "has a lot of anxiety because of her falls in addition to bruising, and she is afraid to go out because she is afraid of falling and hurting herself"); R. 403 (Plaintiff was "very sorry for missing her last 2 [physical therapy] appointments, but was unable to get herself motivated to come out to the appointment secondary to anxiety and fatigue").) The first sentence of the DOT's description of the receptionist position is: "**Receives callers at establishment**, determines nature of business, and directs callers to destination." *See Occupational Group Arrangement*, DOT 237.367-038, 1991 WL 672192 (Receptionist) (emphasis added). Based on this description, the stressor triggering Plaintiff's anxiety (fear of falling when leaving her house) would occur every day as she would work at the "establishment" and could be required to walk and stand up to 2.5 hours a day. *See id.* (defining receptionist job as sedentary, requiring walking and standing "only occasionally," which means "up to 1/3 of the time"). The fact that the "situational

stressors" would occur every day Plaintiff worked at the receptionist position (rather than being unrelated to work) readily distinguishes the cases relied on by the Commissioner. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001) (finding "intake notes support the ALJ's determination that the depression was due to her denial of food stamps and workers compensation and was situational"); *Merrell v. Berryhill*, No. 3:17-CV-00213 PSH, 2018 WL 1916606, at *2 (E.D. Ark. Apr. 23, 2018) (finding "a situational component to [the claimant's] anxiety as he was oftentimes worried about his physical health and about meeting his child support obligations"); *Bowers v. Saul*, No. 19-5029-CV-SW-BP, 2019 WL 13203967, at *2 (W.D. Mo. Dec. 16, 2019) (explaining "[p]laintiff did not report any serious difficulties beyond ordinary/situational issues (such as stress at the holidays, difficulty dealing with her children and her boyfriend, and worries over her physical health and her disability application)").

Plaintiff also correctly argues that the ALJ failed to comply with the regulation precluding the SSA from finding an individual's symptoms inconsistent with the evidence in the record without considering possible reasons she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. Soc. Sec. Ruling 16-3p: Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P ("SSR 16-3p"), at *8 (S.S.A. Mar. 16, 2016). The SSA includes as one illustrative reason that "[a]n individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms." *Id.* at *9. The SSA "will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and

their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them" and "explain how we considered the individual's reasons in our evaluation of the individual's symptoms." *Id.* Here, the ALJ acknowledged the evidence that Plaintiff's anxiety made her not want to leave the house and that she attributed her anxiety in part to fear of falling if she left her house (R. 15, 16, 18, 20, 22), but did not explain how he took that evidence into account when discounting her reports of anxiety and depression because her course of treatment did not include therapy or counseling (R. 25). The failure to comply with SSR 16-3p is legal error requiring remand.[19]

**Fifth**, Plaintiff argues that the ALJ misrepresented her anxiety medication regimen by disregarding the additions and increases in dosages of her medication. (*Id.* at 22-23.) The Commissioner responds that "the ALJ cited treatment notes indicating that providers consistently refilled Plaintiff's 0.5mg of lorazepam, three times per day as needed for anxiety," showing "Plaintiff's medication regime was generally stable," and that the ALJ did not err in not discussing Plaintiff's "added anxiety medications" because "an ALJ is not required to discuss every piece of evidence, and the ALJ's failure to cite specific evidence does not mean it was not considered." (Dkt. 12 at 9.) While an ALJ is not required to discuss all evidence in the opinion, the problem here is that the ALJ's

---

[19] While SSRs do not carry the force of law or regulations, they are still "binding on all components of the Social Security Administration" in accordance with Section 402.35(b)(1) of the Social Security Administration Regulations, and "represent precedent final opinions and orders." 20 C.F.R. § 402.35(b)(1); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990) (citation omitted) (same).

description of Plaintiff's anxiety medication regime as "generally stable with some medications added for sleep but continued lorazepam for use as needed for anxiety" (R. 16), combined with his note that buspirone HCL was added "very recently," in September 2021, fails to account for the fact that Plaintiff tried other anti-anxiety medications and increased dosages of anti-anxiety medications between May 2019 and September 2021.

Plaintiff started duloxetine in Summer 2020, but found it ineffective and only took it for a couple of months.  (*See* R. 447, R. 451, R. 593.)  While she had to decrease her venlafaxine when she started taking Savella in January 2021, her anxiety had increased as of July 2021 and her venlafaxine was restarted at a higher dose.  (*See* R. 593, R. 451.) One record relied on by the ALJ (an August 8, 2019 visit with Dr. Thiessen) notes: "She is also complaining of some increased anxiety for the past month" (R. 479) and stated (apparently to Plaintiff): "I'm hoping the anxiety will improve after you have weaned yourself off of the gabapentin."  (R. 482.)  Another of the visits relied on by the ALJ indicated that Plaintiff had tried duloxetine in Summer 2020 but it was not effective.  (R. 593.)  "Persistent attempts to obtain relief of symptoms, such as increasing dosage and changing medications . . . may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."  SSR 16-3p, at *8. While the ALJ's description of a "stable" anxiety medication regime alone might not be sufficient basis for remand, when combined with the other errors identified in this Report and Recommendation, the Court recommends remand for a thorough and accurate analysis of Plaintiff's anxiety medication regime with the other issues identified in this

Report and Recommendation.  Having considered the ALJ's opinion and the record as a whole, the Court concludes that there are "[s]everal errors and uncertainties in the opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [Plaintiff's] claims to require further proceedings below."  *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008).

*Sixth*, Plaintiff argues that "[t]he ALJ's description of [Plaintiff's] "high level of independence in a wide range of activities of daily living" wholly misrepresents the record.  (Dkt. 10 at 24.)  A "claimant's daily activities" are one factor an ALJ must consider when evaluating the claimant's testimony and subjective complaints.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain.").  "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski*, 739 F.2d at 1322.

The ALJ described Plaintiff as engaging in "relatively high activities of daily living" (R. 22) and "higher activities" (R. 24) when determining her mental impairments were non-severe.  After reviewing Plaintiff's testimony and self-reports as to her activities of daily living, the ALJ cited notes from a November 13, 2019 physical therapy appointment to support his conclusion that Plaintiff had been engaging in "relatively high activities of daily living" or "higher activities."  (*E.g.*, R. 17 ("Notably, in a physical therapy evaluation in November 2019, she reported higher activities, saying she spent a typical day watching TV, doing laundry, cleaning, and cooking. (Ex. 2F, at 18).");  R. 24

(same).)  Apparently the ALJ believed this November 2019 note was evidence that
Plaintiff engaged in watching TV, doing laundry, cleaning, and cooking without
limitation, and therefore reduced the weight assigned to her subjective complaints, as the
ALJ found "[o]verall, [Plaintiff's] activities of daily living are more consistent with the
ability to sustain full time work within the above limitations than with the allegations of
disabling limitations."  (R. 23-24.)

The ALJ's treatment of Plaintiff's activities of daily living is not supported by
substantial evidence.  The record is replete with evidence that while Plaintiff struggled
with doing laundry, cleaning, and cooking.  (*E.g.*, R. 50 (Plaintiff testifying that a typical
day for her consisted of: "Absolutely nothing.  I mean I really do nothing.  I don't get out.
I don't even do the dishes half the time at home.  I don't cook."); R. 296 (Plaintiff stating
in February 4, 2021 Disability Report-Appeal that she was unable to "do daily activities,
[could not] stand or walk for very long, and struggle[d] with cooking meals, doing dishes,
and cleaning her home"); R. 308 (Plaintiff reporting in March 4, 2021 Adult Function
Report that her daily activities included watching TV, "maybe try and do dishes or
something light, maybe 2-3 times [per] week if feeling able," "[s]omething for dinner, I
do love to cook but can't do it much"); R. 309-11 (Plaintiff reporting she prepared "real
meals"[20] about 2-3 times per week depending on her pain level (which took between an

---

[20]    The ALJ describes this as cooking "more complex meals."  (R. 16 (citing Ex. 10E
(R. 307-14)).)  The "real meals" were compared to toast, cottage cheese, or leftovers (R.
309) and Plaintiff described herself as cooking "not nearly as well," where she had
cooked "far more advanced type meals" which "took half the time" before her
impairments (R. 311).

hour and an hour and a half to prepare with breaks); made toast, cottage cheese, "leftovers, if I was able to make a hot dish or ?", and meat and potatoes, "if able"; was able to clean and do laundry "a little at a time," which was all she could do as to indoors and outdoors chores, and it was an "ongoing process" because she "never finish[ed] anything in a single day"; and her partner helped with most of the household chores and "[did] a lot for" her); also stating her hobbies and interests included "just TV [all the time], cooking [2-3 times and not nearly as well], when feeling I can, same with baking [very limited]")[21]; R. 318-20 (Scott A. K. reporting Plaintiff had no "routine schedule of sleep/wake hours[,] wakes in pain – watches TV" and engaged in "[m]inimal activity[,] minimal cleaning, laundry, minimal cooking – baking"; could cook on some days but was unable to do so on other days at which time she prepared "easy" meals like frozen meals, pizza, BLT, and mac-n-cheese, for 2 hours, 4 to 5 nights per week; Plaintiff "used to love to cook" but could no longer "stand, mix, fry for more than 5 minutes"; and with encouragement, did "minimal" inside household chores, including cleaning and laundry, but could not load and unload the dishwasher due to pain, and could not perform any outdoor chores (including yard work) due to pain, exhaustion, and feeling defeated and depressed).)  The ALJ appears to have discounted all this evidence based on the single November 2019 physical therapy note to the exclusion of the remainder of the record.

---

[21]    The ALJ describes Plaintiff as saying she "sometimes did some baking."  (R. 16 (citing Ex. 10E (R. 307-14)).)  In the Report, Plaintiff described her baking as "very limited."  (R. 311.)

The ALJ's treatment of Plaintiff's activities of daily living is similar to the ALJ's conclusion in *Reed v. Barnhart* that a claimant's ability to engage in "activities, such as fixing meals, watching movies, checking the mail, and doing laundry," were "inconsistent with her allegations of constant, debilitating symptoms." 399 F.3d 917, 922-23 (8th Cir. 2005). The Eighth Circuit reversed the district court's affirmance of the ALJ in *Reed* for several reasons, including because:

> We find no such inconsistency, however, in [the claimant's] ability to engage in the activities she described. This is especially so, given the "limitations of her ability to perform many of these activities" alluded to but not explained by the ALJ. These limitations are notable: she does "a little bit of crafts," but within an hour she is frustrated because of her inability to concentrate; she can make the bed, but not put on fitted sheets; she can do household chores, but cannot vacuum the floor or clean the bathtub; she can do the laundry but cannot carry the laundry basket; and, while she can go grocery shopping, she does so only "if forced," only with her mother-in-law, and only as long as they do not stay long.

*Id.* at 923.

The same problem is present here. The ALJ apparently disregarded the evidence of Plaintiff's limited ability to cook, clean, and do household chores as inconsistent with the description of Plaintiff's daily activities in the November 2019 physical therapy note without any explanation of the supposed inconsistency.[22] Indeed, the same note contains objective exam results stating that Plaintiff appeared unsteady when ambulating with a cane and reported falls and social isolation as a result of the falls. (R. 400.) In view of

---

[22]   As to watching TV, the ALJ did not explain how this constituted a "higher" or "high" activity that somehow undermined Plaintiff's subjective complaints. The Eighth Circuit has rejected the idea that watching TV is incompatible with allegations of disability. *See Reed*, 399 F.3d at 923.

the record as a whole, no reasonable mind could find the November 19, 2019 physical therapy note adequate to support the ALJ's conclusion that Plaintiff's activities of daily living were "higher" or "high" and therefore undermined her subjective complaints.

Further, even if the Court found the ALJ's characterization of Plaintiff's activities of daily living supported by substantial evidence, the Eighth Circuit has repeatedly rejected the idea that a claimant's ability to watch TV, visit friends, complete light housework, and go to church undermines the claimant's subjective complaints or means a claimant is not disabled. *See Reed*, 399 F.3d at 923 (collecting cases). The evidence of Plaintiff's activities in the record as a whole does not undermine her subjective complaints.

For all of these reasons, the Court finds that the ALJ's treatment of Dr. Schafer's and Mr. Carroll's opinions is not supported by substantial evidence and based on legal error. The Court recommends remand so the ALJ can reweigh their persuasiveness. Because several of the errors identified above also affected the ALJ's analysis of Dr. Kachgal and Dr. Kuhlman's administrative findings, the Court also recommends remand so the ALJ can revisit the appropriate weight to assign those findings. On remand, the ALJ must apply and explain the consistency and supportability factors as to Dr. Schafer's and Mr. Carroll's medical opinions and Dr. Kachgal and Dr. Kuhlman's administrative findings as required by 20 C.F.R. §§ 404.150c(b)(2) and 416.920c(b)(2). Finally, the ALJ should revisit the severity of Plaintiff's mental impairments and paragraph B findings in view of the above.

The Court turns to Plaintiff's remaining challenges.

**B.      RFC Limitations Due to Mental Impairments, Pain, and Balance Issues**

Plaintiff also challenges the ALJ's failure to incorporate any limitations due to her mental impairments in the RFC and treatment of her subjective complaints of pain. (Dkt. 10 at 28-31.) The Court has recommended remand for reconsideration of the ALJ's treatment of the consulting examiners' opinions and prior administrative findings as to her mental limitations. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe', as "'not severe' impairment(s) . . . may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Consequently, the Court also recommends remand for purposes of re-assessing Plaintiff's RFC as to her mental limitations, regardless of whether the ALJ finds them severe.

This reconsideration should include reconsideration of the effect of pain on Plaintiff's ability to concentrate. (*Id.* at 30.) The ALJ discounted some aspects of Mr. Carroll's opinions because: "[H]e appears to have relied on her physical pain and symptoms. These are outside his area of expertise." (R. 25.) Mr. Carroll stated based on his mental status examination of Plaintiff: "She has problems with focus and attention when she is in pain." (R. 692.) The Commissioner and Plaintiff both cited *Zachary J. E. v. Kijakazi*, No. 22-CV-101 (TNL), 2023 WL 2572229 (D. Minn. Mar. 20, 2023), to support their positions on this issue. (Dkt. 12 at 17; Dkt. 13 at 11.) In *Zachary*, an ALJ found a Doctor of Osteopathic Medicine's opinions that a claimant's "pain and other

symptoms would constantly interfere with his abilities to maintain attention and concentration" and would be distracted by pain and other symptoms were "outside his area of expertise" and therefore unpersuasive because "[the doctor] is not [the plaintiff's] mental health treatment provider." 2023 WL 2572229, at *4, *11. The ALJ and Commissioner in this case now take a contrary position, namely that a licensed psychologist (Mr. Carroll) is not qualified to offer an opinion as to the effect of pain on Plaintiff's ability to concentrate. (Dkt. 12 at 17.) Mr. Carroll did not offer an opinion as to the cause of Plaintiff's pain, rather, he offered an opinion as to her ability to concentrate based on his observations of Plaintiff during the mental status examination. (R. 692.) Given that the Eighth Circuit has reversed an ALJ for discrediting a spouse's testimony (based on personal observation) that a claimant "has been in great pain since [an] accident" when the ALJ did not articulate any discrepancies in the testimony, *Neely v. Shalala*, 997 F.2d 437, 438, 441 (8th Cir. 1993), the Court is not persuaded that licensed psychologist Mr. Carroll was not qualified to draw opinions based on his personal observations of Plaintiff, including whether she appeared to be in pain and her ability to concentrate at those times. It was error for the ALJ to discount Mr. Carroll's opinions as to Plaintiff's ability to concentrate when in pain.[23]

Plaintiff also argues that the ALJ improperly discounted her subjective complaints of pain based on her activities of daily living. For the reasons stated in Section IV.A, the ALJ's treatment of Plaintiff's activities of daily living were not supported by substantial

---

[23] The determination of how much weight to give subjective complaints lies with the ALJ, but the ALJ must have a legitimate basis for discrediting relevant evidence.

evidence and did not comply with the applicable regulations. The Court agrees that remand is appropriate as to the weight assigned to her subjective complaints of pain to the extent the ALJ relied on Plaintiff's activities of daily living when discounting those complaints.

The Court next addresses Plaintiff's physical therapy attendance. To the extent the ALJ discounted Plaintiff's subjective complaints of pain because she did not complete physical therapy, the ALJ was required to consider precipitating and aggravating factors. *See Polaski*, 739 F.2d at 1322. Here, there is evidence that Plaintiff avoided physical therapy because she was anxious about leaving her house. (R. 397-98, 403.) The Court recommends that the ALJ be required to consider that evidence when evaluating Plaintiff's subjective complaints of pain on remand.

Finally, the Court addresses Plaintiff's use of a cane. Plaintiff contends that in finding she did not need a cane for standing, the ALJ failed to consider supportive objective evidence and her subjective complaints, instead cherry picked the record, and failed to consider the frequency and intensity of her pain. (Dkt. 10 at 26-28.) Plaintiff argues that the ALJ erred "by failing to account for [her] use of a cane for balancing and standing" and that the receptionist job would be precluded, based on the VE's testimony, that sedentary jobs, including the receptionist job, would be precluded if a cane is required for "balancing *or* standing." (*Id.* at 17-18, 26 (quoting R. 56) (italics added by Plaintiff).) Plaintiff also argues that she falls even "despite use of her cane as the issue is 'balance deficits'/imbalance." (*Id.* at 28 (citing R. 429, R. 602, R. 715).) Finally,

Plaintiff argues that the ALJ failed to address employer tolerance for falling at work. (*Id.*)

The Commissioner responds that "use of a cane or other assistive device for standing was not supported, given Plaintiff's limited findings and normal strength." (Dkt. 12 at 12 (citing R. 21).) Further, the Commissioner notes the ALJ's reliance on the fact that physical therapy was helpful when determining Plaintiff did not require a cane for standing. (Dkt. 12 at 12 (citing R. 21, R. 690).)

As to the ALJ's reliance on the helpfulness of physical therapy when rejecting a cane for standing, the ALJ noted that she "did not continue after only two treatment sessions." (R. 19.) Because the ALJ did not consider the evidence that Plaintiff did not attend physical therapy due to her anxiety about falling when leaving her house, remand is appropriate so the ALJ can reconsider her balance issues and need for a cane in view of this evidence.

Another issue raised by the Commissioner's argument is that the only supporting record cited by the ALJ and Commissioner is Plaintiff's January 2020 surgical consultation, which the ALJ erroneously described as a May 2020 surgical consultation. (R. 21; Dkt. 12 at 12 & n.1.) The ALJ's statements that "the physical examination findings have been limited and have shown full strength and sensation and no ataxia or loss of coordination" and "[i]n other exams, no problems with standing were noted" are otherwise unsupported. (R. 21.) Moreover, it is unclear whether the ALJ relied on the "telehealth" visits for this proposition, which is concerning given how many of them did not involve video and could not have included any physical examination.

56

In any event, other physical examinations support Plaintiff's subjective complaints of imbalance when standing.  For example, a July 22, 2019 examination documented strength 4+/5 in the bilateral lower extremities with weakness most noticeable in the left hip flexor muscles.  (R. 485.)  A February 2020 lumbar MRI noted advanced degenerative changes including "continued impingement or pinching of the nerves that run down the legs," "explaining the bilateral buttock and leg symptomatology."  (R. 393-94, 426).  The November 22, 2019 King-Devick balance test resulted in "[Plaintiff] losing balance on 6 occasions recovering each time" while in right and left tandem stances, with "[c]ues needed to validate testing to not grab onto bars and to attempt to recover balance with trunk."  (R. 403.)  The ALJ described this examination as noting "significant balance problems."  (R. 19.)  Plaintiff's falls worsened through the years up to her last visit of record in October 2021.  (*See e.g.*, R. 397, 466, 471, 475, 501, 601, 651, 700, 704, 715.)  The Court recommends remand so the ALJ can reconsider the evidence that Plaintiff required a cane when standing or balancing, and therefore whether, based on the VE's testimony "that a cane is acceptable for sedentary jobs to ambulate to the position, but not for balancing or standing," the receptionist position is precluded. (*See* R. 56.)

Finally, the Court addresses Plaintiff's argument that "[t]he ALJ failed to address employer tolerance for failing [sic] while at work" (which the Court reads as "falling while at work").  (Dkt. 10 at 28.)  In *Tasha W. Comm. of Soc. Sec.*, the court remanded a case for further proceedings, including development of further expert testimony, because it "seems likely an employee who had no ability to balance and was apparently at

continuous risk of falling due to dizziness and lightheadedness from vertigo would strain those employer tolerances, but the hypotheticals presented to the VE did not address this issue." 3:20-CV-731 (TWD), 2021 WL 2952867, at *11 (N.D.N.Y. July 14, 2021). Here, as the ALJ noted, Plaintiff had "significant balance problems" as of November 2019 and "the primary care notes show that [Plaintiff] has consistent reported problems with multiple falls per month, from the alleged date of onset through the present" where "[t]he use of a cane for walking is generally consistent with the balance problems and reports of falls." (R. 21.) Given that Plaintiff continued to fall during the period she was using a cane and fell while using a cane (R. 683 (April 6, 2021 notes stating "She had one tripping accident while using [her] cane since her last visit with a slide to the ground a week from last Saturday"); R. 722 (May 4, 2021 notes stating "[a] week ago last Saturday she had another fall, tripping over her cane going into her house"), remand is appropriate so the ALJ can obtain testimony from a VE as to an employer's tolerance for her level of falling. *See Vicky R. v. Saul*, Case No. 19-cv-2530 (ADM/ECW), 2021 WL 536297, at *14 (D. Minn. Jan. 28, 2021) ("A hypothetical question need . . . include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole.").

\* \* \*

For the reasons stated above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Dkt. 10) be granted in part and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 12) be denied.

The Court further recommends that this case be remanded to the Commissioner for further proceedings consistent with this opinion.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff Mary S.L.'s Motion for Summary Judgment (Dkt. 10) be **GRANTED in part**;

2.     Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 12) be **DENIED**; and

3.    This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation.


DATED: November 16, 2023                    _s/Elizabeth Cowan Wright_
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).